**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Erasmo CORRAL–MARTINEZ,
Defendant-Appellant.**

No. 77–5680.

United States Court of Appeals,
Fifth Circuit.

April 2, 1979.

Jose Escobar, Mario J. Martinez, El Paso, Tex., for defendant-appellant.

Jamie C. Boyd, U. S. Atty., LeRoy M. Jahn, Wayne F. Speck, Asst. U. S. Attys., San Antonio, Tex., for plaintiff-appellee.

Before GEWIN, RONEY and GEE, Circuit Judges.

GEE, Circuit Judge:

Erasmo Corral-Martinez appeals his convictions of conspiracy to import, importation, and possession of heroin, violations of 21 U.S.C. §§ 963, 952(a) and 841(a)(1). He challenges the introduction into evidence of the heroin found in his car during a search at the border and the district court's determination that his post-arrest statement had been voluntary. He also complains about being tried with his cousin, an alleged co-conspirator,[1] about a possible prosecutorial reference to his silence, and about a jury instruction. For the reasons discussed below, we reject his contentions and therefore affirm his conviction.

## I. The Facts.

At midmorning on June 16, 1977, customs officers on duty at the Presidio, Texas, port of entry were discussing two recent heroin seizures at the Texas-Mexican border involving cars with Illinois license plates, driven by Mexicans legally residing in the United States. Senior Customs Inspector Trevino then decided to search any car with Illinois plates that crossed the border that day. A few minutes later, with disastrous timing from their point of view, Corral-Martinez and his cousin, Jose Corral, crossed the bridge into the United States in a late model sedan bearing Illinois plates. When he sighted the plates, Officer Trevino decided the car would have to be searched. Another officer began the primary inspection and reported to Trevino that the men claimed to have been in Mexico about ten days, had alien registration cards indicating that they were Mexican citizens legally residing in the United States, and that they had two or three curios to declare. Trevino ordered that a secondary inspection be done and, while another officer began checking the luggage, ran a computer check which proved negative. Trevino then began to inspect the car, starting with the door on the passenger side, to determine whether any screws had been tampered with. Apparently before noticing anything in particular, Trevino was called away by the officer at the luggage inspection table who had found a loaded pistol in a coat that had been hanging in the car's back seat.

Erasmo Corral-Martinez admitted that the weapon was his and denied having other weapons in the car or on his person. At that point he was in police detention pending further processing.[2] While questioning Erasmo, Trevino noticed a bulge in his trousers around the waistline and decided to do pat-down searches, followed by strip searches of the two men. He found a zippered leather pouch containing $500.00 around Erasmo's waist and only loose American and Mexican currency in Jose's pockets. During the searches which were done while the two suspects were separated, each man was asked why he had gone to Mexico. Erasmo said that he and his cousin had gone to visit a very sick uncle. Jose on the other hand said he had gone simply as a tourist and, when questioned specifically about the uncle, denied visiting any sick

---

1. Erasmo's cousin, Jose Corral, was tried with Erasmo and found guilty. The district court thereafter acquitted him because, with most of the incriminating evidence suppressed due to *Miranda* and *Bruton* problems, Jose's participation was reduced to appearing as "mere presence" or "association" with Erasmo.

2. Though failure to declare a firearm is a violation of the Tariff Act, Officer Trevino testified that persons found with concealed weapons at Presidio are not arrested, but rather are detained briefly while the violation is recorded for further administrative procedures.

relative.[3] At a suppression hearing Officer Trevino testified that, at this point, "because of the contradictions and everything, I was reasonably sure that there was contraband in the car." Trevino then took his screwdriver and began removing door panels and other coverings in the car, finding 34 pounds of heroin worth more than a million dollars concealed behind the panels in the rear passenger area of the car.

Trevino next arrested the two, handcuffed them, and took them back into his office. He read them their *Miranda* rights in Spanish; both men said they understood their rights. Neither indicated a desire to make any statement, and they were not questioned further. DEA officials who have exclusive jurisdiction over processing such offenses were notified and the closest agent, Agent Alcorn from Midland, Texas, approximately 260 miles away, was dispatched immediately to Presidio. En route he stopped at Marfa, Texas, to see that the magistrate who was closest to Presidio would be available later in the afternoon. When Alcorn arrived at Presidio at about 4:30 p. m., the defendants were given forms, printed in Spanish, regarding their *Miranda* rights. Each read his copy and indicated understanding, but refused to sign the form or waive his rights to remain silent. When each indicated he did not wish to make a statement, Alcorn withdrew to begin the necessary paperwork. A few minutes later Erasmo Corral called Trevino over and said he wanted to talk with Alcorn. Trevino and Alcorn took him aside and after reminding him of his rights accepted his oral statement that an unknown person had asked him and Jose to drive his car to Gomez Palacio in Durango, Mexico, leave the car parked there, and return the next day; that they were to drive the car back to a Chicago suburb and leave it parked near a factory; that in return each was to receive $1,500. After completing his

paperwork, Agent Alcorn drove the two men to Marfa, where they appeared before the magistrate approximately eight hours after their arrest.

## II. The Search Issue.

 Erasmo Corral-Martinez urges that the 34 pounds of heroin should have been suppressed because it was "fruit of the poisonous tree"—secured as a result of exploiting the contradictory statements he and Jose had made without benefit of *Miranda* warnings. In support he cites *United States v. McCain*, 556 F.2d 253 (5th Cir. 1977), and *United States v. Castellana*, 488 F.2d 65, 67–68 (5th Cir.), *rev'd on other grounds*, 500 F.2d 325 (1974) (en banc). We observe that it was the trial judge himself who, after careful reflection on our cases regarding custodial situations at the border,[4] first speculated that, in addition to suppressing the contradictory statements themselves, he perhaps should also suppress the heroin as "fruit" of the ill-gotten statements. So troubled was he by this issue that he ordered a supplemental hearing to assure himself that the search had not been an "exploitation of [the] illegality" prohibited under the principles of *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). He heard a second rendition of the events by Officer Trevino and then made specific findings of fact (1) that when Trevino saw that the car had Illinois plates, he made up his mind that the car would have to be searched, and (2) that the search was not the result of exploitation of defendants' statements since the decision to search had already been made. Acceptance of appellant's argument would necessitate our finding these determinations clearly erroneous, and this we cannot do. There is sufficient basis for them in the record—a record constructed as a result of the judge's attention to the precise issue raised here. We cannot substitute any after-the-fact im-

3. These contradictory statements as to the purpose of their trip were suppressed by the trial court who found that the suspects were "in custody" for *Miranda* purposes after the gun was found. Since they had not yet received the proper warnings, their statements could not be

used against them. *United States v. McCain*, 556 F.2d 253 (5th Cir. 1977); *United States v. Salinas*, 439 F.2d 376 (5th Cir. 1971).

4. See cases in note 3, *supra*.

pression of ours that the suppressed statements must have affected the decision to search or the extent of the search done. Nor are we troubled by the fact that the decision to search appellant's car was made on the basis of a generalized suspicion of cars bearing Illinois plates. The knowledge of the customs agents of recent drug hauls in cars matching the exact profile of appellant's made their decision a reasonable exercise of discretion rather than merely an arbitrary one. Moreover, exercise of customs powers to do full searches at the border itself need not be predicated on any suspicion at all. *United States v. Ivey*, 546 F.2d 139, 144 (5th Cir.), *cert. denied*, 431 U.S. 943, 97 S.Ct. 2662, 53 L.Ed.2d 263 (1977); *United States v. Bowman*, 502 F.2d 1215, 1219 (5th Cir. 1974).

III. Voluntariness of the Statements.

■ Appellant next challenges the district court's finding that he spoke voluntarily in making his statement to Agent Alcorn regarding the inducement for his Mexican trip. He argues that there was undue delay in taking him before a magistrate, that the continued detention and attempts at interrogation were for the sole purpose of securing incriminating statements, and that his previous indications that he did not wish to talk meant that he had not voluntarily waived his right to remain silent. Some additional force is added to his contentions by our recent decision in *United States v. Hernandez*, 574 F.2d 1362 (5th Cir. 1978), in which we stated that repeated *Miranda* warnings did not make the recipient more fully aware of his rights but rather indicated to him that the police must not mean what they say. We are not persuaded, however, that the district court committed any error, much less clear error, in finding appellant's statement voluntary. The facts developed at the evidentiary hearing are substantially different from the facts involved in *Hernandez*. In that case the appellant first received *Miranda* warnings immediately upon arrest. He was then confined in the close quarters of a police wagon for nearly five hours, though the police station was only minutes away. Upon his 5 a. m. arrival at the station he was again read his rights in the midst of attempts to elicit conversation and to secure his cooperation in return for favorable probation reports. Though the appellant had explicitly refused to speak and may have even requested an attorney, the police began another round of questioning fifteen minutes later, following new warnings. It was either during this session or another one some 30 minutes later that the appellant made the incriminating statements which we ruled must be suppressed because his "right to cut off questioning" had not been "scrupulously honored." 574 F.2d at 1368–69, citing *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975).

In contrast, the record below amply supports the court's findings that when the first *Miranda* warnings were given and Erasmo and his cousin indicated they wished to make no statements, the officers ceased interrogation immediately. Erasmo testified that while awaiting Agent Alcorn the officers had treated them courteously, offering them coffee, ensuring that their handcuffs were not too tight, and looking after their other physical needs. The men were not threatened or harassed in any way. When Agent Alcorn arrived, some four and one-half hours after the arrest, second *Miranda* warnings were given at his request. The men were not questioned further once they again indicated a desire to remain silent. Erasmo himself initiated the final exchange by telling Trevino that he wished to speak to "the man"—Agent Alcorn. Before beginning the questioning Alcorn had Trevino remind Corral-Martinez that he was not obligated to speak. Though Erasmo denied that he had fully understood his rights and testified he felt compelled to speak, he also admitted on cross-examination that his conscience had something to do with his telling the agents about the deal. He further admitted that he had made up his own mind to talk to them and that nobody made him do it.

■ As for the delay in bringing the men before the magistrate, it is simply a factor that must be considered along with other

factors in determining voluntariness, and such delay must be "unnecessary" before it will render a confession inadmissible. *United States v. Odom*, 526 F.2d 339, 343 (5th Cir. 1976). In *Napier v. United States*, 387 F.2d 147 (5th Cir. 1967), *cert. denied*, 393 U.S. 860, 89 S.Ct. 141, 21 L.Ed.2d 130 (1968), we held that a full day's delay did not necessitate suppression of incriminating statements when the machinery to bring the suspect before the authorities had been set in motion, the appellant had been repeatedly advised of his rights, and he had requested that agents be summoned so he could make a statement. The delay below was not for the purpose of allowing uncounseled interrogation but was rather the necessary consequence of the DEA's exclusive jurisdiction over the offenses involved. Agent Alcorn, the closest DEA agent, used all due haste in taking the men before the magistrate. Considering the totality of these circumstances, the district court correctly found that Erasmo's statement was voluntary and thus admissible.

IV. Refusal to Sever.

 Before trial both defendants requested a severance on the ground that introduction of their conflicting statements about the reason for their trip to Mexico would raise *Bruton* problems.[5] This ground for severance evaporated when the court granted their additional motions to suppress those statements because they were made in custody without benefit of *Miranda* warnings. Thereafter Jose Corral orally renewed his request for severance on other grounds, while Erasmo did not. It is likely, therefore, that Erasmo waived any claim that severance should have been granted for some other reason. On appeal he argues nevertheless that joinder of his trial with Jose's lessened the government's burden of proving each element of the offense. Because such a charge, if true, might rise to the level of plain error, we reach the merits of this claim. Erasmo's claim is based on the theory that to prove a conspiracy the government must prove an agreement between two or more people. With Jose present as a visible codefendant, the jury was easily persuaded of that element—so much so that both were convicted and the court had to step in and acquit Jose. It is difficult to conceive of such prejudice occurring in the instant case, however, because of the availability of Erasmo's own admission that his trip to Mexico was the result of an agreement with someone in Chicago whose name Erasmo could not recall or refused to reveal. Moreover, the existence and complicity of these other unknown persons was clearly highlighted in the closing arguments to the jury, by Erasmo's own counsel as well as by the government attorney. See the discussion quoted in Part V below. Because the charges against Erasmo and Jose arose from the same act or transaction, their joinder was proper under Rule 8(b), Fed.R.Crim.P. A proper joinder will not be reversed on appeal unless it is shown that the trial court grossly abused his discretion to grant severance because of possible prejudice, thereby denying the defendant a fair trial. *United States v. Partin*, 552 F.2d 621 (5th Cir.), *cert. denied*, 434 U.S. 903, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977); *United States v. Strand*, 517 F.2d 711 (5th Cir.), *cert. denied*, 423 U.S. 998, 96 S.Ct. 428, 46 L.Ed.2d 373 (1975). Such conditions are not present here.

V. Prosecutorial Comment on Defendant's Silence.

In making his closing argument to the jury, appellant's attorney commented that, to keep up with the law of supply and demand for narcotics, "it demands higher connections than these two humble defendants have, and when you speak to me of a conspiracy, these two men and others, I would like to see the giant of organized crime brought here with them. . . . And when you speak to me about possession with intent to distribute, I would like to see in this courtroom seated with them the gorillas and the people that prey upon our citizens by selling that horrible junk." Moments later the prosecutor rose to review

5. *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

the evidence. Agreeing that there must have been others in the conspiracy who supplied the large amounts of money needed to finance it, he added, "maybe we would know who they were if Erasmo Corral had said more when he had the chance to, to Trevino and to Alcorn. . . . Mr. Escobar says, 'I wish we had the goons . . seated here at the table,' and do I, too. . . Why didn't Erasmo tell us who they were? And they might be here because we certainly would have gone after them, I assure you of that." At that point appellant's attorney objected on the ground that the prosecutor was commenting on Erasmo's failure to take the stand, the argument reasserted on appeal. The trial judge overruled the objection, reasoning that the comments were made in response to the earlier argument made by counsel. Counsel did not request a cautionary instruction, but moments later the court on his own motion cautioned the jury about the defendant's fifth amendment privilege not to testify and ordered them to disregard the prosecutor's remarks if capable of being construed as a comment on Erasmo's right not to take the stand. The prosecutor then responded that his only reference in making the comment had been to Erasmo's voluntary statement to Alcorn and Trevino.

■ The standard for assessing prosecutorial remarks that might be deemed comments upon a defendant's failure to testify is whether the remark was manifestly intended or was "of such a character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *United States v. White*, 444 F.2d 1274, 1278 (5th Cir.), *cert. denied*, 404 U.S. 949, 92 S.Ct. 300, 30 L.Ed.2d 266 (1971). We think it clear from the circumstances outlined above that the remark was responsive to defendant's own argument, was not intended to be a comment on the exercise of fifth amendment rights, and would naturally be regarded as a reference to Erasmo's post-arrest statement rather than to his stance at trial. Moreover, in light of the strong evidence of Erasmo's guilt any possible prejudicial error was rendered harmless by the court's sua

sponte instruction and his further caution in the general charge. *United States v. Corbo*, 555 F.2d 1279 (5th Cir.), *cert. denied*, 434 U.S. 928, 98 S.Ct. 413, 54 L.Ed.2d 287 (1977).

## VI. Jury Instruction Regarding Knowledge.

■ The final point of appeal involves the Model Penal Code definition of "knowingly" that was used in instructing the jury. The challenged language allows the required element of knowledge to be established by "proof that the Defendant was aware of a high probability that the substance he possessed was heroin, unless he actually believed that the substance he possessed was not heroin." Corral-Martinez argues that this definition lessened the prosecution's burden to prove each element of the offense beyond a reasonable doubt and that it infringed his right not to testify. Because our court had recently approved other aspects of the Model Penal Code definition in *United States v. Restrepo-Granda*, 575 F.2d 524 (5th Cir. 1978), this claim was all but abandoned at oral argument. Moreover, no objection to the jury charge was made at trial. Appellant can succeed here only if any defect in the instruction amounted to plain error, which it did not. Arguments employed by the Supreme Court in *Turner v. United States*, 396 U.S. 398, 90 S.Ct. 642, 24 L.Ed.2d 610 (1970), easily dispose of any claim of such prejudice. In *Turner* the Court was evaluating a statutory inference by which possession of various narcotics could be deemed sufficient evidence to support a conviction for knowing importation "unless the defendant explains the possession to the satisfaction of the jury." After assessing the presumption as regards heroin possession and citing approvingly the Model Penal Code definition of knowledge that it had earlier employed in *Leary v. United States*, 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969), the Court ruled that because the inference is sound, the jury instructions had not violated Turner's right to be convicted only on a finding of guilt beyond a reasonable doubt and did not place impermissible pressure upon him to

testify in his own defense. On the latter point, the Court observed:

> The same situation might present itself if .there were no statutory presumption and a prima facie case of concealment with knowledge of unlawful importation were made by the evidence. The necessity of an explanation by the accused would be quite as compelling in that case as in this; but the constraint upon him to give testimony would arise there, as it arises here, simply from the force of circumstances and not from any form of compulsion forbidden by the Constitution.

396 U.S. at 418 n.35, 90 S.Ct. at 653, *quoting Yee Hem v. United States*, 268 U.S. 178, 45 S.Ct. 470, 69 L.Ed. 904 (1925).

The identical reasoning disposes of appellant's claim here, at least in the absence of any attack on the validity of the Model Penal Code inference of knowledge itself.

Accordingly, the conviction is AFFIRMED.