**Sonia JACOBS a/k/a Sonia Linder,
Petitioner–Appellant,**

v.

**Harry K. SINGLETARY, Marta
Villacorta and Jim Smith,
Respondents–Appellees.**

No. 90–5293.

United States Court of Appeals,
Eleventh Circuit.

Feb. 6, 1992.

---

Sonia Jacobs, pro se.

G. Richard Strafer, Quinon & Strafer, P.A., Miami, Fla., Christie E. Webb, Los Angeles, Cal., for petitioner-appellant.

Robert A. Butterworth, Atty Gen., Dept. of Legal Affairs, Carolyn M. Snurkowski, Asst. Atty. Gen., Tallahassee, Fla., for respondents-appellees.

Before FAY, Circuit Judge, JOHNSON [*], Senior Circuit Judge, and MERHIGE [**], Senior District Judge.

JOHNSON, Senior Circuit Judge:

This case arises on appeal following the district court's denial of Sonia Jacobs' petition for a writ of habeas corpus.

## I. STATEMENT OF THE CASE

### A. *Background Facts*

On the morning of February 20, 1976, Florida State Trooper Phillip Black (Black) approached a car parked at a rest stop on Interstate 95. Black was accompanied by Donald Irwin (Irwin), a visiting Canadian law enforcement officer. Black saw Walter Norman Rhodes (Rhodes) asleep in the driver's seat, Jesse Joseph Tafero (Tafero) asleep in the front passenger seat, and Sonia Jacobs (Jacobs) and her children asleep in the rear seat. Spotting a gun in the car, Black removed it and requested that Rhodes provide personal identification.

Black discovered that Rhodes was a convicted felon on parole and ordered Rhodes to stand in front of the car. Black then ordered Tafero and Jacobs out of the car. When Tafero did not quickly comply, Black pulled him out of the car. The two began scuffling. Jacobs remained in the car.

Black grabbed Tafero and pushed him against the patrol car. Irwin then held Tafero as Black radioed for backups. When Tafero struggled again, Black drew his service revolver. Tafero and the trooper started struggling.

Rhodes testified that Tafero reached for the trooper's gun arm. One to three shots were fired. Rhodes stated that he then turned and saw Jacobs holding a nine millimeter gun in both hands. Tafero snatched the gun from Jacobs. Tafero then fired at the trooper four or five times and then fired at Irwin twice. Tafero, testifying on behalf of Jacobs, claimed that while he and Black were struggling, Rhodes shot Black and then Irwin.

The group fled in the trooper's car. Shortly thereafter they commandeered a Cadillac and took its owner hostage. After crashing into a police roadblock, Jacobs, Rhodes and Tafero were placed into custody.

### B. *Procedural History*

On March 3, 1976, Jacobs, Tafero, and Rhodes were indicted for two counts of first degree murder, theft of a firearm and a car, and kidnapping. Rhodes pled guilty and received a life sentence in exchange for his cooperation. Tafero's and Jacobs' trials were ordered severed. Jacobs was convicted on all counts.[1] The judge imposed a death sentence despite the jury's recommendation of a life sentence.

On direct appeal, the Supreme Court of Florida, *sua sponte*, ordered the trial judge to divulge whether he imposed the death sentence after considering any information not known to Jacobs. The trial judge revealed that he had considered a presentence investigation report (PSI) unavailable to Jacobs. The Supreme Court ordered the lower court to release the PSI. Upon review, Jacobs' counsel discovered that Rhodes, the state's most important eyewitness, had undergone a confidential polygraph examination and that his statements during this examination differed in several material respects from his trial testimony.

---

[*] *See* Rules of the U.S. Court of Appeals for the Eleventh Circuit.

[**] Honorable Robert R. Merhige, Jr., Senior U.S. District Judge for the Eastern District of Virginia, sitting by designation.

1. Tafero was tried, convicted and, following the exhaustion of his appeals, he was executed.

The Florida Supreme Court temporarily relinquished its jurisdiction so that the trial court could evaluate whether withholding the polygraph report violated *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The trial court found that the prosecution did not improperly withhold the polygraph report because it was consistent with Rhodes' trial testimony. This ruling was then consolidated with the rest of the appeal. The Florida Supreme Court affirmed the conviction but reversed the death sentences. *Jacobs v. State*, 396 So.2d 713 (Fla.1981). Jacobs was resentenced to two concurrent life sentences on the murder counts to be served with the third concurrent life sentence on the kidnapping count.

On November 25, 1985, Jacobs filed a petition for a writ of habeas corpus in federal district court. Jacobs alleged: (1) the state suppressed Rhodes' statements to the polygraph examiner in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); (2) the trial court improperly refused to instruct the jury fully on Jacobs' theory of defense or on the limits of aiding and abetting; (3) the state violated Jacobs' Fifth Amendment rights by introducing post-arrest statements; (4) the trial court violated her right to due process by admitting unnecessary and graphically gory photographs. The magistrate recommended that the petition be denied. While the report was under consideration by the district court, Jacobs learned that Brenda Isham, her cellmate, had perjured her testimony at Jacobs' trial. With this new development, the district court granted Jacobs a stay of the proceedings so she could exhaust the issue in the state courts.

After exhausting the claim relating to Isham, Jacobs filed an amended petition for a writ of habeas corpus in June of 1988. A magistrate judge held an evidentiary hearing on the perjury issue but Isham refused to attend, citing a fear of retaliation. The magistrate judge recommended that the amended petition be denied in light of Isham's failure to appear. Habeas counsel moved to reopen the hearing after they were able to convince Isham to return to Florida. On April 14, 1989, Isham attended a hearing but suffered a heart attack during cross-examination. Her testimony was later completed through a videotaped deposition.

The magistrate judge ruled that although Isham's trial testimony was perjured, the prosecution did not knowingly use it and the testimony in any event was not central to the state's case. The district court denied the amended petition for a writ of habeas corpus on all grounds. This appeal followed.

## II. ANALYSIS

Jacobs raises the following claims on appeal: (1) the state knew or should have known that it used perjured testimony; (2) the state withheld impeachment evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); (3) the trial court violated her right to due process by refusing to instruct the jury that the mere presence of a defendant at the scene of a crime is insufficient to justify conviction; (4) the state denied her Fifth Amendment right to silence as recognized by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); (5) the trial court violated her right to due process by admitting graphic photographs of the victims. We address these contentions in turn below.

### A. *Isham's Perjured Testimony*

Jacobs argues that the state's use of Isham's perjured testimony violated her right to due process of law.[2] Having al-

---

2. Jacobs cites other portions of Isham's deposition to argue that the prosecution impermissibly encouraged Isham to perjure her testimony. *See United States v. Wilson*, 904 F.2d 656, 659 (11th Cir.1990), *cert. denied*, — U.S. —, 112 S.Ct. 250, 116 L.Ed.2d 205 (1991) (prosecutor may not encourage witness to perjure testimo-ny). Isham testified that the detectives warned that she might suffer an increased jail sentence if she failed to testify. She stated that the detectives also told her that it would be in her best interests not to make an enemy of the politically ambitious prosecutor. Finally, Isham claims that the prosecutor coached her on *how* to an-

ready established that Isham's testimony was false and was used by the state, Jacobs must now prove that the prosecution knew or should have known that the testimony was false, and that the perjured testimony was material. *See Williams v. Griswald*, 743 F.2d 1533, 1542 (11th Cir.1984); *see generally, Giglio v. United States*, 405 U.S. 150, 153–54, 92 S.Ct. 763, 765–66, 31 L.Ed.2d 104 (1972).

■ The district court found that "neither the prosecutors [n]or police officers told [Isham] what to say or had any reason to disbelieve her story." The question of whether the state knew or should have known about the perjury and whether the perjury was material involves mixed questions of law and fact. We exercise *de novo* review over legal findings and apply the clear error standard to all factual findings. *United States v. Premises Located at Route 13*, 946 F.2d 749, 755 (11th Cir.1991); *United States v. Wragge*, 893 F.2d 1296, 1298 n. 4 (11th Cir.1990).

■ Jacobs argues that the prosecution should have known Isham's testimony was perjured because (1) Isham had initially told state detectives that she knew only "jailhouse gossip" about Jacobs, and (2) state investigators later failed to corroborate her story. If the detectives indeed learned that Isham knew only gossip about Jacobs, then the prosecution must be charged with the same knowledge. *See Williams v. Griswald*, 743 F.2d at 1542; *Schneider v. Estelle*, 552 F.2d 593, 595 (5th Cir.1977). Jacobs relies exclusively on Isham's deposition testimony in arguing that the detectives learned only jailhouse gossip. Isham's testimony on this issue, however, is unreliable. The district court

found that Isham in her deposition was credible only in her "highly significant and dramatic" recantation of her trial testimony. After an independent review of the record, we agree with the district court that her testimony was otherwise rife with inconsistencies. Isham could not remember whether it was she or the state investigators who initiated the discussion in which she first mentioned Jacobs. Although Isham indeed testified at one point that she told the investigators that she knew only "jailhouse gossip" about Jacobs, Isham in the same deposition later claimed that she could not recall the substance of what she told the detectives about Jacobs. The district court thus did not clearly err in finding that Isham had not informed investigators that she knew only gossip. Moreover, the fact that state detectives failed to corroborate her testimony after interviewing three other cellmates of Jacobs rendered Isham's testimony only less credible, not incredible. We therefore find no error in the lower court's holding that the prosecution neither knew nor should have known that Isham would commit perjury during Jacobs' trial.[3]

### B. *Brady Violation*

Rhodes, the only eyewitness to testify that Jacobs had fired the first shot, submitted himself to a polygraph examination prior to trial. According to the polygraph examiner's report:

[Rhodes] saw Tafero struggling with Trooper Black, heard a loud report, and then saw Tafero go to the back seat of the Camaro, take out a gun and fire four times at Black, and two times at Irwin. [Rhodes] could not be sure whether or not Sonia [Jacobs] had fired at all. He

swer questions during her pre-trial deposition, although she conceded that he did not attempt to alter or shape her testimony. We find that Isham's claims show only that the prosecution strongly pressured Isham to testify, not that the prosecution desired or encouraged her to perjure her testimony.

**3.** Having found that the prosecution neither knew nor should have known of the perjury, we need not inquire whether the perjury was material. Jacobs nonetheless urges this Court to find that even unknowing use of perjured testi-

mony constitutes a violation of due process. *See Sanders v. Sullivan*, 863 F.2d 218 (2d Cir. 1988). We have previously ruled that only knowing use of perjured testimony constitutes a due process violation. *See Smith v. Wainwright*, 741 F.2d 1248, 1257 (11th Cir.1984), *cert. denied*, 470 U.S. 1087, 105 S.Ct. 1853, 85 L.Ed.2d 150 (1985). Assuming *arguendo* that we were inclined to agree with the *Sanders* court, we are not free to disregard prior decisions of this Circuit. *See United States v. Machado*, 804 F.2d 1537, 1543 (11th Cir.1986).

further stated that no discussion concerning the shooting ever took place from the time they left the crime scene, until the time they were captured at the road block.

Jacobs argues that because Rhodes' statement to the polygraph examiner differed from his trial testimony in several significant respects, the prosecution withheld impeachment evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

■ The state court found that the polygraph examiner's report would not have been helpful to Jacobs because the report was consistent with Rhodes' trial testimony. The district court reviewed the record and affirmed. The district court in its review, however, incorrectly accorded the state court's findings a presumption of correctness pursuant to 28 U.S.C.A. § 2254(d) (1977). *See* 28 U.S.C.A. § 2254(d) (state court's factual findings presumed correct). The question of whether a prior statement is consistent with trial testimony is a mixed question of law and fact and thus reviewable *de novo*. *Davis v. Heyd*, 479 F.2d 446, 451 (5th Cir.1973).

■ In *Brady*, the Court held that a prosecutor violates an accused's due process rights by withholding material evidence favorable to the accused. To prove a *Brady* violation, Jacobs must demonstrate that (1) the prosecution suppressed evidence, (2) the suppressed evidence was favorable to her or exculpatory, and (3) the suppressed evidence was material. *Aldridge v. Dugger*, 925 F.2d 1320, 1325 (11th Cir.1991). The first prong is satisfied by the state's concession that it failed to provide a copy of the examiner's report to the defense.

With regard to *Brady*'s second prong, Jacobs argues that the examiner's report was critical to her defense in four respects. First, the report reveals that Rhodes was unsure whether Jacobs had fired the gun. At trial, Rhodes testified that Jacobs definitely shot the trooper and that she was the first to shoot. The state counters that this inconsistency is insignificant, since the defense had access to another statement by

Rhodes in which he declared that although he was not positive that Jacobs fired the first shot, he believed that she did. This statement, however, indicates that Rhodes had grounds for believing that Jacobs shot Trooper Black. In contrast, Rhodes' polygraph statement reveals only that he was simply uncertain over Jacobs' role in the shooting. At the very least, then, the examiner's report possessed greater impeachment value. *See United States v. Piccinonna*, 885 F.2d 1529, 1536 (11th Cir.1989) (polygraph testimony may be admitted when used to impeach or corroborate testimony of witness at trial).

Second, Rhodes told the jury that he witnessed Tafero taking a gun from Jacobs, whereas in the report he described Tafero as merely retrieving the gun from the backseat of the car. The state argues that the difference between the two stories is made insignificant by the fact that Rhodes told Captain Haley that Tafero "either grabbed [Jacobs'] gun or grabbed another one [in the backseat]." Although the defense did use the Haley statement for impeachment purposes on cross-examination, the statement contained in the polygraph report would have directly contradicted Rhodes' trial testimony.

Third, Rhodes testified at trial that he had asked Tafero "what happened at first" during the shooting. Tafero, Rhodes claimed, answered that "Sonia took care of it." In the examiner's report, however, Rhodes was described as stating in absolute terms that "no discussion concerning the shooting ever took place."

Finally, Rhodes testified at trial that he heard a first shot from a nine millimeter gun, followed immediately by a louder shot from the trooper's gun. Tafero, Rhodes testified, then grabbed the gun from Jacobs. His trial testimony thus requires Jacobs to have fired the first shot. On the other hand, the polygraph report, describing only one "loud report" before Tafero retrieved the gun, indicates that the trooper fired the first shot and that Tafero fired all of the remaining shots. The examiner's report is therefore clearly favorable to Jacobs: Rhodes' prior statements to the poly-

graph examiner support Jacobs' argument that she was a passive passenger in the vehicle, and not the instigator of the killings.

■ Turning to *Brady*'s third prong, we consider whether the report was material. *See U.S. v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). Evidence is material for the purposes of *Brady* "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would be different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985); *Stano v. Dugger*, 883 F.2d 900, 905 (11th Cir.1989).

■ We find that Rhodes' polygraph testimony significantly clashes with his statements at trial, and was more damning than other equivocal statements made by Rhodes and available to the defense. Under Florida rules of evidence, the defense could have entered this report both to impeach the witness and to establish the truth of the matter asserted. *See* Fla.Stat. Ann. § 90.801(2) (West 1979). The examiner's report, if accepted as the truth, impeaches Rhodes' inculpatory trial testimony on several issues which centrally concern Jacobs' guilt or innocence. The examiner's report would therefore have provided the defense with more than merely insignificant supplemental support for cross-examination purposes. *See, e.g., United States v. Benz*, 740 F.2d 903, 915–16 (11th Cir. 1984), *cert. denied*, 474 U.S. 817, 106 S.Ct. 62, 88 L.Ed.2d 51 (1985) (no *Brady* violation where evidence would have provided additional support for cross examination but same information substantially otherwise presented to jury). The report was likely to have been particularly compelling to jurors because it was monitored by a polygraph. *See Carter v. Rafferty*, 621 F.Supp. 533 (D.N.J.1985), *aff'd in relevant part*, 826 F.2d 1299 (3d Cir.1987), *cert. denied*, 484 U.S. 1011, 108 S.Ct. 711, 98 L.Ed.2d 661 (1988) (because jurors believe that polygraph examinations are accurate and that witnesses reveal the truth when undergoing the examination, prosecution committed material *Brady* violation by withholding statement given during polygraph test that was inconsistent with later statement at trial). *But cf. United States v. Piccinonna*, 885 F.2d at 1536 (polygraph evidence should not be admitted unless trial court determines that probative value of polygraph evidence outweighs its potential prejudice and time consumption involved in presenting such evidence). Although Rhodes lacked strong credibility, his trial testimony was the state's only significant evidence besides Jacobs' alleged statements to Ms. Isham, to Trooper Trice, and to Lieutenant Farinato.[4] Isham fabricated her statement, and as discussed below, Jacobs' alleged statement to Trice was one of three statements obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Moreover, the state presented inconclusive physical evidence. Tests conducted by the state's ballistics expert showed only that it was possible for a gun to have been fired from the inside of the car. The medical examiner was unable to draw conclusions about the origin of the shots from his examination of the victims. All of the identifiable shell casings and bullets matched the type of gun found on Tafero. Paraffin tests were taken. Rhodes' test results were the only results consistent with having fired a gun.

We therefore find it reasonably probable that the disclosure of the examiner's report would have altered the outcome of a trial untainted by the admission of Isham's perjured testimony and of Jacobs' statements obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The state's suppression of the examiner's report satisfies the three prongs of the *Brady* test and thus constitutes grounds for reversal.

---

4. The state also presented two additional eyewitnesses. Both were truck drivers who observed the events from a considerable distance. Neither of these witnesses could discern who fired any of the shots, though one concluded that the shots came from the back seat of the car.

## C. *Jury Instruction*

Jacobs argues that she was entitled to a jury instruction stating that "a defendant's mere presence at the scene of a crime and even knowledge of illegal activity is insufficient to cause a conviction to result." The state trial court rejected this instruction even though it is undisputed that the requested instruction was a correct statement of law and that her defense depicted her as merely present at the site of the shootings. The court instead intended to give a standard charge on principles of aiding and abetting, although the court at first neglected to provide this instruction. After the jury had deliberated for eleven hours over the issue of Jacobs' guilt, it submitted three questions regarding the degree of participation necessary for conviction: (1) whether a person's degree of participation in a crime determines that person's degree of guilt, (2) whether active or passive participation renders each person equally responsible for the crime, and (3) whether a passive participant should be considered an accomplice. The court responded by reading the instruction it had earlier intended to provide:

> As to Principals, I instruct you that a person may commit a crime by his own personal act, or do the act or acts of another person. Any person who knowingly aids, abets, counsels, hires or otherwise procures the commission of a crime, is equally guilty with the one who actually performs the criminal act, whether or not he is or is not present at the commission of the offense.
>
> However, for one person to be guilty of a crime physically committed by another, it is necessary that he have a conscious intent that the criminal act shall be done; and that pursuant to that intent, he do some act or say some word which was intended to, and which did incite, cause, encourage, assist or induce another person to actually commit the crime.[5]

The court again refused to give the mere presence charge.

An error in instructing the jury cannot constitute a basis for habeas relief unless the error "so infected the entire trial that the resulting conviction violates due process." *Henderson v. Kibbe*, 431 U.S. 145, 154, 97 S.Ct. 1730, 1736, 52 L.Ed.2d 203 (1977); *Futch v. Dugger*, 874 F.2d 1483, 1488 (11th Cir.1989). It is not sufficient that the instruction was "undesirable, erroneous, or even 'universally condemned.'" *Henderson v. Kibbe*, 431 U.S. at 154, 97 S.Ct. at 1736 (quoting *Cupp v. Naughten*, 414 U.S. 141, 146, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973)).

Jacobs contends that the proffered instruction, while not erroneous, was incomplete because the jury might have construed Jacobs' mere presence in the car as an "act." "An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Id.* at 155, 94 S.Ct. at 404. The effect of an incomplete instruction must be evaluated in light of the remainder of the charge and the trial as a whole. *Lamb v. Jernigan*, 683 F.2d 1332, 1339 (11th Cir.1982), *cert. denied*, 460 U.S. 1024, 103 S.Ct. 1276, 75 L.Ed.2d 496 (1983).

After the court had neglected to provide an aiding or abetting instruction, the jury submitted three questions that revealed its confusion over the distinction between active and passive participation in a crime. We find that the court timely issued a responsive instruction that clarified that one who is not a principal is guilty only if she (1) has a "conscious intent" that a crime be committed and (2) "act[s]" or speaks some word that incites, causes, encourages, assists or induces another to commit a crime. Therefore, one who fails to "act" or speak a word—in other words, one who is merely present at the site of the crime—cannot be found guilty of the crime committed. Jacobs provides no reason for this Court to believe that the jurors made the counterintuitive construction that her mere presence could constitute a qualifying "act." Indeed, the counterintuitive be-

---

5. Florida state courts may recall juries to provide additional instructions. *See* Fla.Crim.Rule 3.420 (West 1989).

comes almost incredible in light of the fact that such a construction would have rendered entirely pointless the central effort of the defense: to portray Jacobs as "merely present" at the time of the shooting. The trial court's failure to adopt the suggested instruction thus did not violate Jacobs' due process rights.

### D. Miranda Violations

Jacobs argues that the trial court's admission of five statements attributed to her violated her rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *Miranda* provides that law enforcement officials in custodial interrogations must inform a suspect that she has the right to remain silent, that anything she says may be used against her in court, that she has a right to an attorney, and that the state will provide her with an attorney if she cannot afford to pay for one. *Id.* at 473–74, 86 S.Ct. at 1627–28.

▪ Following the car crash at the roadblock, Jacobs made several statements to the police. She allegedly made the first statement immediately following the crash. Without informing Jacobs of her *Miranda* rights, Trooper Trice asked her, "Do you like shooting troopers?" Jacobs purportedly answered, "We had to."[6] Jacobs argues that this statement should have been excluded because she was in custody and had not been informed of her right to remain silent.

Only persons in custody must receive *Miranda* warnings before questioning. *Roberts v. United States*, 445 U.S. 552, 560, 100 S.Ct. 1358, 1364, 63 L.Ed.2d 622 (1980); *United States v. Torkington*, 874 F.2d 1441, 1445 (11th Cir.1989). "[I]n order for a court to conclude that a suspect is in custody, it must be evident that, under the totality of the circumstances, a reasonable man in the suspect's position would feel a restraint on his freedom of movement fairly characterized [so that] he would not feel free to leave." *United States v. Phillips*, 812 F.2d 1355, 1360 (11th Cir.1987); *see California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983). The state court's finding that Jacobs was not in custody when the statement was made is one of mixed law and fact. *United States v. Torkington*, 874 F.2d at 1445. Although we review strict factual findings under a clearly erroneous standard, we review the application of law to these facts *de novo*. *Id.*

Jacobs made the statement after emerging from a car that had attempted to run a police roadblock and that had been fired upon by law enforcement officials. All of the officers present had weapons drawn. Trooper Trice, armed with a twelve gauge shotgun, testified that he "grabbed her" and had placed her "in custody." We find that a reasonable person in Jacobs' position clearly would not have felt free to leave. Because she had not been informed of her *Miranda* rights before answering Trooper Trice, the trial court should have excluded this statement.[7]

Jacobs also claims that four additional statements should have been suppressed because they were improperly elicited by the police after she had invoked her right to remain silent. We must first inquire whether she had in fact invoked her right to silence.

▪ "If the individual indicates *in any manner*, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Lightbourne v. Dugger*, 829 F.2d 1012, 1018 (11th Cir.1987) (emphasis in original)

---

6. Another trooper standing nearby claimed Jacobs did not respond to the question; Jacobs denied making the statement. Trooper Trice neglected to include this purported statement in a report prepared immediately after the incident.

7. The state argues that the statement should nonetheless be admissible because Jacobs volunteered the statement without any instigation. The state contends that Trooper Trice's question—"Do you like shooting troopers?"—was purely rhetorical and thus noncoercive. Assuming *arguendo* the question was rhetorical, if the accused is in custody, the police do not read the accused her rights, and a question is asked and answered, then the statement must be suppressed. *Harryman v. Estelle*, 616 F.2d 870, 873 (5th Cir.1980), *cert. denied*, 449 U.S. 860, 101 S.Ct. 161, 66 L.Ed.2d 76 (1980).

(quoting *Miranda*, 384 U.S. at 473–74, 86 S.Ct. at 1627–28), *cert. denied*, 488 U.S. 934, 109 S.Ct. 329, 102 L.Ed.2d 346 (1988). Law enforcement officials therefore must cease an interrogation if the suspect provides merely an "equivocal" or "ambiguous" indication of his desire to remain silent. *Delap v. Dugger*, 890 F.2d 285, 290 (11th Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 2628, 110 L.Ed.2d 648 (1990) ("equivocal indication" suffices); *Lightbourne*, 829 F.2d at 1018 ("ambiguous" invocation bars further questioning about investigation). The suspect must only in some manner "evidence[ ] a refusal to talk further." *Moore v. Dugger*, 856 F.2d 129, 134 (11th Cir.1988).

■ After the initial exchange between Trooper Trice and Jacobs, Trice read Jacobs her *Miranda* rights. Jacobs said nothing else. She was placed in a patrol car. When Detective Gary Hill then repeatedly asked Jacobs her name, she refused to respond, telling him that "it didn't matter," and that "it didn't make any difference." Hill then recited her rights from a card and asked her to sign the card. Jacobs simply returned the card unsigned. Hill next asked her to write just her first name on the card. She again said nothing, and refused to comply. Hill still again asked her to sign the card. Jacobs finally wrote "I understand" on the card. Later at the police station, she repeatedly refused to respond when Hill again persisted in

attempting, as Hill described it, "to get her name out of her." At trial, Hill concluded, "[s]he didn't want to tell me." Hill characterized his efforts throughout this period as an attempt "to find out what her status was in [the shootings]."[8] Although Jacobs had not expressly invoked her right to remain silent, by repeatedly refusing to speak at all to Hill, even to the point of not giving her name, Jacobs provided at least an equivocal or ambiguous indication that she wished to remain silent. *Compare Martin v. Wainwright*, 770 F.2d 918 (11th Cir.1985), *modified on other grounds*, 781 F.2d 185 (11th Cir.), *cert. denied*, 481 U.S. 1033, 107 S.Ct. 1965, 95 L.Ed.2d 536 (1986) ("Can't we wait until tomorrow" constitutes equivocal indication of right to cut off questioning) *with Delap v. Dugger*, 890 F.2d at 292–93 (questions regarding how long it would be before suspect could return home not an indication of "wish[ ] to terminate or delay questioning").

■ Once a suspect demonstrates her desire to terminate questioning, law enforcement officials may not take statements from the suspect unless they "scrupulously honor[ ]" the suspect's right to remain silent. *Miranda*, 384 U.S. at 479, 86 S.Ct. at 1630; *Michigan v. Mosley*, 423 U.S. 96, 103–04, 96 S.Ct. 321, 326–27, 46 L.Ed.2d 313 (1975). In *Mosley*, the Supreme Court ruled that the police had scrupulously honored the suspect's right to cut off questioning. The Court found three

8. We find that Hill's persistent questioning constitutes "interrogation" and not a "routine inquiry" permissible even after a suspect has requested that questioning cease. *See Christopher v. State*, 824 F.2d 836, 845 (11th Cir.1987) (example of routine inquiry is whether suspect would like drink of water), *cert. denied*, 484 U.S. 1077, 108 S.Ct. 1057, 98 L.Ed.2d 1019 (1988). The police subject a person to the functional equivalent of interrogation when they engage in conduct that they "should know [is] reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1979); *see Endress v. Dugger*, 880 F.2d 1244, 1249 (11th Cir.1989), *cert. denied*, 495 U.S. 904, 110 S.Ct. 1923, 109 L.Ed.2d 287 (1990). Detective Hill's conceded purpose in questioning Jacobs was essentially to " 'open up a more generalized discussion relating directly or indirectly to the investigation.' " *Christopher*, 824 F.2d at

845 (quoting *Oregon v. Bradshaw*, 462 U.S. 1039, 1045, 103 S.Ct. 2830, 2834, 77 L.Ed.2d 405 (1983)); *see Rhode Island v. Innis*, 446 U.S. at 301, 100 S.Ct. at 1689 (intent of police relevant to determining whether questioning constitutes "interrogation"). Hill was aware that she had already been placed into custody. He then repeatedly attempted to ascertain her name, first within a patrol car, and next at a police station. We find that Hill should have known that the circumstances of his questioning and particularly the persistent, unflagging nature of his inquiry were inherently coercive and thus "reasonably likely" to produce an incriminating response. *See United States v. Poole*, 794 F.2d 462, 467 (9th Cir.1986) (agent who was not arresting officer and who asked questions about name and date of birth for investigatory purposes conducted "interrogation") (*cited with approval, Christopher*, 824 F.2d at 845).

factors particularly persuasive: (1) the police immediately ceased their interrogation once the suspect invoked his right to end questioning; (2) the police resumed questioning only after the passage of a "significant amount of time" and after administering fresh *Miranda* warnings; (3) the police in their second round of questioning focused on a different crime. *Id.* at 106, 96 S.Ct. at 327. Although determining whether the police have "scrupulously honored" the suspect's right requires a case-by-case approach, *Jackson v. Dugger*, 837 F.2d 1469, 1472 (11th Cir.1988), *cert. denied*, 486 U.S. 1026, 108 S.Ct. 2005, 100 L.Ed.2d 236 (1988), this prophylactic standard minimally requires that for a "significant period of time" after a suspect has exercised her right to remain silent, the police must refrain from questioning her unless "the suspect both initiates further conversation and waives the previously asserted right to silence." *Delap v. Dugger*, 890 F.2d at 290; *Christopher v. State*, 824 F.2d at 836, 841–42. The police must equally honor equivocal and clear invocations. *Delap*, 890 F.2d at 290.

 Despite the fact that Jacobs quickly established that she desired to remain silent, Hill continued to question her about her identity until she finally stated that she was Sandy Jenkins and that she had joined the men as a hitchhiker. Hill clearly ignored Jacobs' right to cut off questioning. Although Hill may have been unsure whether Jacobs was indicating that she desired to remain silent, he was entitled only to clarify whether she wished to remain silent. *Owen v. State of Alabama*, 849 F.2d 536, 539 (11th Cir.1988). Instead, Hill improperly persisted in probing her identity until he elicited this statement.

 Within twenty minutes of this round of questioning, Hill moved Jacobs to another office in the police station for additional questioning. Jacobs was again advised of her *Miranda* rights. She executed a waiver form and made another exculpatory statement, differing from the first but equally untrue. Because an insignificant amount of time had passed since Jacobs had invoked her right to remain silent, the police could take a statement only if she both had waived her right and had initiated further conversation. *See Delap*, 890 F.2d at 290. Although Jacobs clearly waived her right, her exculpatory statement was not "the product of a conversation initiated by the suspect." *Christopher*, 824 F.2d at 844. The trial court thus should have also suppressed this statement.

Before another hour had passed, Jacobs asked Sergeant Paul Weber where her children were. Weber told her that they were in the safe custody of one of the secretaries. Jacobs next inquired of Weber why she was at the police station. Weber responded that she was being detained as a suspect in a shooting. Jacobs then pressed Weber for more information about her status. At this point, Weber asked Jacobs how she felt about the shootings, if she recognized the name of one of the other suspects, and then if she had ever fired a gun. Jacobs disclosed that she owned and had fired two handguns.

The state stresses that Jacobs' exchange with Weber occurred over two hours after Jacobs initially invoked her right to remain silent. The state contends that because the passage of over two hours constitutes a "significant period" of time, the police were free to resume interrogation under *Delap*, 890 F.2d at 290, and *Christopher*, 824 F.2d at 844.

Law enforcement officials have been found to have scrupulously honored a suspect's right to terminate questioning in cases in which as little as one to two hours separated a suspect's invocation of her rights and *one* subsequent interrogation. *See United States v. Nash*, 910 F.2d 749, 752 (11th Cir.1990) ("over one hour"); *Mosley*, 423 U.S. at 104, 96 S.Ct. at 327 ("interval of more than two hours"). In these cases, however, the police had carefully observed other procedural safeguards of *Miranda*. In *Nash*, officials "ceased questioning" the suspect and "left him alone" after he first indicated that he did not want to make a statement. *Nash*, 910 F.2d at 752. The second period of questioning came only at the suspect's request. *Id.* In *Mosley*, the police likewise immediately

ceased their interrogation at the suspect's request, and over two hours later questioned him about an unrelated crime.

Courts that have found more than two rounds of questioning acceptable have also found much longer periods of time between the invocation and the subsequent interrogations as well as similar careful attention to *Miranda* safeguards. *See, e.g., United States v. Corral-Martinez,* 592 F.2d 263, 267 (5th Cir.1979) (invocation and second interrogation separated by four and one-half hours, with a third round of questioning at invitation of one suspect; officers treated suspects courteously and immediately ceased interrogation after suspects' invocation of right to silence); *United States v. Udey,* 748 F.2d 1231, 1241–42 (8th Cir.1984) (three periods of questioning followed invocation at approximate intervals of six hours, three days, and two days; police immediately ceased interrogation upon each invocation of right to silence and provided fresh *Miranda* warnings prior to signing of waiver), *cert. denied,* 472 U.S. 1017, 105 S.Ct. 3477, 87 L.Ed.2d 613 (1985); *cf. Jackson v. Dugger,* 837 F.2d at 1472 (police administered *Miranda* warnings three times over six hours, but invocation preceded their second attempt to interrogate by six hours; police immediately ceased questioning upon suspect's invocation of right to remain silent).

■ Determination of the "significant period" following an invocation of the right to remain silent, as an inquiry merely corollary to that of determining scrupulous observance, thus involves careful scrutiny of the totality of the circumstances. *See Jackson v. Dugger,* 837 F.2d at 1432; *United States v. Hernandez,* 574 F.2d 1362, 1369. (5th Cir.1978). We would eviscerate *Miranda* were we to hinge our evaluation of scrupulous observance on only the passage of a discrete amount of time from the suspect's invocation of her right to remain silent until a given round of subsequent questioning. Under the rule urged by the state, we would find scrupulous observance whether or not the police persisted in questioning the suspect during the hours between a suspect's invocation and a later interrogation session. We decline to adopt an analysis that would "frustrate the purposes of *Miranda* by allowing repeated rounds of questioning to undermine the will of the person being questioned." *Mosley,* 423 U.S. at 102, 96 S.Ct. at 325; *see United States v. Hernandez,* 574 F.2d at 1369.

■ In the instant case, Detective Hill re-initiated questioning six times before Sergeant Weber began questioning Jacobs. Hill continued his interrogation long beyond the point at which Jacobs had effectively invoked her right to cut off questioning. We find that the nature and frequency of the interrogation of Jacobs up to this point renders insignificant the passage of little more than two hours between Jacobs' invocation and Weber's questioning.

Because Weber's questioning occurred during the "significant period," this questioning triggers the prophylactic rule requiring suppression of elicited statements unless the suspect both "initiated" the round of questioning and voluntarily waived her right to silence. *Delap,* 890 F.2d at 290; *Christopher,* 824 F.2d at 844. A suspect "initiates" questioning if she " 'evince[s] a willingness and a desire for a generalized discussion about the investigation.' " *Henderson v. Dugger,* 925 F.2d 1309, 1312 (11th Cir.1991) (quoting *Oregon v. Bradshaw,* 462 U.S. 1039, 1045–46, 103 S.Ct. 2830, 2835, 77 L.Ed.2d 405 (1983)). Jacobs' first question to Weber, "Where are my children?", was not an expression of interest in the investigation. At most Jacobs wished to discover the status of her two children who had been removed from her after she had been placed into custody. Immediately following Weber's response, however, Jacobs clearly evinced a willingness and desire to discuss the investigation by asking why she was being detained at the police station. *See, e.g., Henderson v. Dugger,* 925 F.2d at 1312–13 (suspect initiated questioning by asking "what was going to happen next?"); *United States v. Valdez,* 880 F.2d 1230, 1232, 1234 (11th Cir.1989) (suspect initiated dialogue by inquiring "Where are we going?" shortly after being placed into custody). Because

Weber had asked Jacobs no questions prior to this point, we find that Jacobs "initiated" the ensuing dialogue.

■ Jacobs' subsequent statement to Weber is still inadmissible unless she also waived her previously asserted right to silence. *Delap*, 890 F.2d at 290; *Christopher*, 824 F.2d at 844. A suspect may waive her *Miranda* rights either expressly or impliedly. *See United States v. Gonzalez*, 833 F.2d 1464, 1466 (11th Cir.1987). Prior to making her incriminating statements to Weber, Jacobs accosted Weber and asked her three successive questions. We find that her latter two questions impliedly indicated that she wished to relinquish her right to remain silent in favor of an extended dialogue about her case.

A waiver is valid, however, only if it is made voluntarily, knowingly and intelligently. *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612. We must consider the "totality of the circumstances" in making this determination. *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986); *Dunkins v. Thigpen*, 854 F.2d 394, 398 (11th Cir.1988), *cert. denied*, 489 U.S. 1059, 109 S.Ct. 1329, 103 L.Ed.2d 597 (1989). A determination of voluntariness turns on whether the waiver "was the product of a free and deliberate choice rather than intimidation, coercion or deception." *Dunkins*, 854 F.2d at 398 (quoting *Moran*, 475 U.S. at 421, 106 S.Ct. at 1141). Though we may consider her initiation of the dialogue as a factor in our determination of voluntariness, we may not conflate the initiation and waiver inquiries. *See Oregon v. Bradshaw*, 462 U.S. at 1045–46, 103 S.Ct. at 2835.

■ Undoubtedly, repeated interrogations during the two hours preceding this dialogue progressively undermined Jacobs' ability to maintain her silence. *See Mosley*, 423 U.S. at 102, 96 S.Ct. at 326. We therefore discount the fact that during the prior, police-initiated interrogation she made both an oral and a written waiver of her *Miranda* rights. Yet nearly an hour had passed uninterrupted since her last round of questioning. Moreover, the Weber dialogue was not a product of police deception or coercion. *See Dunkins*, 854 F.2d at 399. To the contrary, Jacobs approached Weber. Her second question, "initiating" the dialogue for *Miranda* purposes, clearly signaled that she wished to discuss her case. When she followed with another question concerning the investigation, she indicated her willingness to pursue an extended dialogue on the subject. We hold therefore that Jacobs made a voluntary waiver.

For a waiver to be made knowingly and intelligently, it must be made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Dunkins*, 854 F.2d at 398 (quoting *Moran*, 475 U.S. at 421, 106 S.Ct. at 1141). In the two hours preceding the Weber dialogue, the police had provided Jacobs with *Miranda* warnings at least three times. Less than an hour before her conversation with Weber, the police had recited the *Miranda* rights sentence by sentence, asking Jacobs after each sentence if she understood her rights. Jacobs stated each time that she understood, and then signed a printed waiver form. Jacobs was a mature adult of at least average intelligence. Although it would have been preferable for Weber to have renewed the *Miranda* warnings prior to asking questions about the shootings, we do not find this factor decisive. *See Moore v. Dugger*, 856 F.2d at 133–34 (renewal of *Miranda* warnings not critical to admissibility of confession). We find that the "totality of the circumstances" indicates that Jacobs voluntarily, intelligently and knowingly waived her right to silence. Because Jacobs also "initiated" the dialogue in which she made her inculpatory statement, the trial court properly allowed the admission of this statement.

■ Jacobs made her final contested statement that same afternoon, approximately seven hours after she had invoked her right to remain silent. Jacobs allegedly told Lieutenant Farinato (Farinato) that she wanted to talk to him in private. Farinato arranged to transport Jacobs in his car. After being advised of her rights by Farinato, Jacobs explicitly waived her right to remain silent. Jacobs purportedly

told him that she fired the first shot from the car. She stated that someone then said "give me a gun, give me a gun." Jacobs threw the gun to Tafero, who proceeded to shoot "the trooper and ... the Canadian."

The trial court properly admitted this last statement. Although this final exchange followed unacceptable police conduct, Jacobs had enjoyed a significant, uninterrupted period of time since her prior interrogation. Jacobs spontaneously offered to speak about the investigation. Farinato then offered her another opportunity to invoke her right to silence by administering fresh *Miranda* warnings. She waived her right to remain silent and then immediately gave an unsolicited description of the murders. *See Delap v. Dugger,* 890 F.2d at 290.

We find, however, that the trial court's improper admission of three of the five statements constitutes reversible error. *See Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The majority of the state's most probative evidence was erroneously admitted. Three of Jacobs' five statements violated *Miranda,*[9] and Isham's damaging testimony was perjured. The state violated *Brady v. Maryland* by presenting its most important eyewitness without disclosing a prior statement that both contradicted the eyewitness' trial testimony and supported Jacobs' defense theory.

### E. *The Photographs*

■ Jacobs contends that she was denied due process by the admission into evidence of sixteen graphic photographs of the bodies of the victims during autopsy and at the scene of the shooting. This argument is without merit.

We review state court evidentiary rulings on a petition for habeas corpus to determine only " 'whether the error, if any, was of such magnitude as to deny petitioner his right to a fair trial.' " *Futch v.*

*Dugger,* 874 F.2d at 1487 (quoting *Osborne v. Wainwright,* 720 F.2d 1237, 1238 (11th Cir.1983)). Erroneously admitted evidence deprives a defendant of fundamental fairness only if it was a " 'crucial, critical, highly significant factor' in the [defendant's] conviction." *Williams v. Kemp,* 846 F.2d 1276, 1281 (11th Cir.1988), *cert. denied,* 494 U.S. 1090, 110 S.Ct. 1836, 108 L.Ed.2d 965 (1990) (quoting *Jameson v. Wainwright,* 719 F.2d 1125, 1126–27 (11th Cir.1983), *cert. denied,* 466 U.S. 975, 104 S.Ct. 2355, 80 L.Ed.2d 827 (1984)). The introduction of graphic photographic evidence rarely renders a proceeding fundamentally unfair. *Futch v. Dugger,* 874 F.2d at 1487; *see also, e.g., id.* (photograph of victim, nude, showing wounds made by gunshot); *Evans v. Thigpen,* 809 F.2d 239, 242 (5th Cir.1987), *cert. denied,* 483 U.S. 1033, 107 S.Ct. 3278, 97 L.Ed.2d 782 (1987) (nine color slides of homicide victim) (*cited with approval* in *Futch v. Dugger,* 874 F.2d at 1487). The photographs were used by the medical examiner to support his testimony regarding the origin of the gunshots. The medical examiner's testimony was largely inconclusive. Because the photographs served a minor role in the state's case, their admission if erroneous did not deprive Jacobs of her right to a fair trial.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM in part, REVERSE in part, and REMAND the case to the district court with instructions to grant the petition for a writ of habeas corpus conditioned on the state's affording Jacobs a new trial.

**9.** The admissible statement to Weber, revealing that Jacobs likely owned the handgun used to commit the shootings, was relatively insignificant. Moreover, the credibility of the statement to Farinato is not unassailable. Farinato insisted that Jacobs referred to Irwin as "the Canadi-

an," although there is no evidence in the record indicating how she could have known he was Canadian at that point in time. When they arrived at the Detective Division, Jacobs denied talking with Farinato, refused to say anything else, or sign a statement.