NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0630n.06

Case No. 10-3072

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

*Aug 26, 2011*

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE SOUTHERN |
| RONELL RHODES, | ) | DISTRICT OF OHIO |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |
| _____ | ) | |

BEFORE: BOGGS and CLAY, Circuit Judges; and TARNOW[*], Senior District Judge.

**TARNOW, Senior District Judge.** Defendant-Appellant Ronell Rhodes appeals from his drug and firearm convictions resulting from a conditional guilty plea that reserved his right to appeal the denial of his motion to suppress evidence. For the reasons set forth below, we **AFFIRM** the district court's order denying the motion.

**I. BACKGROUND**

**A. Factual background**

Rhodes' appeal is centered on the issue of credibility and two conflicting factual accounts of what transpired on February 19, 2009, the date of his arrest. That day, Dayton police officer Ronald Velez was working as part of the Special Enforcement Team, which goes out to areas known for guns and drugs. According to the sworn testimony of Officer Velez, which the district court

---

[*]The Honorable Arthur J. Tarnow, Senior United States District Judge for the Eastern District of Michigan, sitting by designation.

credited at the evidentiary hearing held on the motion to suppress, he and Detective John Riegel were driving down Xenia Avenue in a police cruiser and noticed that a car at least three or four blocks away was jutting out of an alley into oncoming traffic, causing cars to swerve into the officers' lane to avoid it. Defendant Rhodes was sitting in the car, which was completely stopped. It took Velez and Riegel about ten or fifteen seconds, or three or four blocks, to reach and pass Rhodes. Velez, who was riding as the passenger in the cruiser, testified that as they approached Rhodes, they saw him turn and "making a stuffing motion towards like the center console." As they were right in front of Rhodes and about to pass him, they observed him cover his face with his hands, shielding his identity.

According to Velez, they continued driving down Xenia and pulled over to do a turn around so that they could go back and check on the vehicle. They had to wait several seconds to turn because there were cars coming. As they turned around, Velez could still see Rhodes' car, which remained stationary and jutting into traffic. When they reached the other lane upon turning, they heard tires squeal and observed Rhodes driving quickly towards the back of the alley. They then pulled into the alley and saw the car parked in the middle of the alley. Officer Velez testified that he saw the driver's door open and Rhodes exit the vehicle, leaving the door open. Velez then got out and, in a yelling voice, identified himself as a police officer. Velez ran after Rhodes as he fled into the nearby apartment of his girlfriend, Erica Taylor.

Velez testified that he saw the apartment Rhodes went into and knocked at the back, again identified himself as a police officer, and ordered that the door be opened. Rhodes opened up the blinds and looked at Velez. Velez once again identified himself and ordered that the door be opened,

which Rhodes refused to do. Other officers went to the front of the apartment and Rhodes eventually did also. Velez also went to the front and advised Rhodes to open the door so that Velez could verify some information because Rhodes was going to be ticketed for impeding traffic. Rhodes denied doing anything wrong and refused to open the door. Ultimately, he opened it and Taylor gave the police consent to search the residence. Rhodes was taken into custody on the basis that he obstructed official business when he ran from the car and failed to obey Velez's order to stop. Rhodes was also cited for impeding traffic. Velez testified that he did not hit Rhodes in the residence, nor did any other officer.

In accordance with the Dayton Police Department's towing policy, it was determined that the vehicle in the alley would be towed. The policy states, "Driver/Owner Arrested: Vehicles operated by drivers without an operator's license, while under suspension, operating while under the influence or where the vehicle was used in the commission of a crime should preferably be towed from where they were stopped, including private property." The policy also permits the police to release the vehicle to the owner of the car if he or she is present. A license plate check was run on the vehicle and it was found that Rhodes was not the owner. The owner was not present.

The towing policy further directed that the vehicle be inventoried prior to towing in an arrest situation, including "property inside the vehicle's passenger compartment, glove box, console, and trunk...." According to Velez, after Rhodes was taken into custody and it was learned that he lacked a driver's license, Velez conducted an inventory search of the car before it was towed. Velez found a plastic sleeve inside the glove box that looked like it had been tampered with and removed it to

make sure there was nothing inside. Upon removing it, Velez found two handguns, a scale, and a bag of crack cocaine.

Rhodes and Erica Taylor offered testimony at the evidentiary hearing conflicting with that offered by Officer Velez. Rhodes denied that the vehicle was protruding into the street. He testified that although he saw the police vehicle drive by him when he was sitting in the vehicle in the alley, he did not see it turn around. Rhodes stated that when he lost sight of the police, he got out of the car and went into the apartment. Both Rhodes and Taylor testified that Rhodes was inside for five or ten minutes before police came to the door. Taylor testified that she did not consent to the police searching the residence and that the police hit Rhodes. Rhodes maintained that the police searched the car before running a check on his name to see if he had a valid license.

**B. Procedural history**

Rhodes was indicted on February 24, 2009 on three counts: 1) Possession with intent to distribute five or more grams of cocaine base in violation of 21 U.S.C. §841(a)(1) and (b)(1)(B); 2) Possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. §924(c)(1)(A); 3) Possession of a firearm by convicted felon in violation of 18 U.S.C. §922(g)(1) and 924(a)(2). On May 21, 2009, he filed a motion to suppress the evidence seized, asserting that the police lacked grounds for stopping and searching the vehicle. He contended that he was parked legally at the time of the stop and that he was inside the residence for five to ten minutes before police came. He also argued that the vehicle search was improper, as it preceded the registration check, and that the search of the residence was improper, as police were never given consent.

4

After a two-day evidentiary hearing, the district court denied the motion to suppress on September 29, 2009, concluding that the stop and search of the vehicle were not unlawful. Crediting the testimony of Officer Velez, the court concluded that the police had probable cause to stop Rhodes after observing him obstructing traffic in violation of the law. The court went on to find that other factors contributed to a finding of reasonable suspicion and probable cause to stop and detain Rhodes, including Rhodes' driving in reverse, fleeing the car, not shutting the door, disobeying orders to stop, and arguing with officers about coming outside the apartment. Moreover, once Rhodes was detained and found to be unlicensed, there was probable cause to arrest him. There was also probable cause to arrest him for obstructing official business, as he had fled from police while they were investigating the alleged traffic offense.

The district court further held that the inventory search pursuant to the arrest was permissible under case law, including *South Dakota v. Opperman*, 428 U.S. 364, 372 (1976), as it was conducted pursuant to the city's inventory policy allowing a search in the instant situation since the driver was being arrested and the registered owner was not present. The district court concluded that:

> Rhodes' testimony indicated that the vehicle search occurred before Officer Velez determined that he was not the owner of the vehicle.... However, Rhodes also claims that he had been inside the Xenia Avenue apartment for approximately five to ten minutes before officers approached him, and he denies running from the police. If this were true, it is hard to understand how the police could have located him. Given this discrepancy, the Court will credit the testimony of Officer Velez where the two are in conflict.

Finally, the district court did not make a specific finding as to the legality of the search of the

5

apartment, but did conclude that there was no causal relationship between the evidence found in the car and the search of the apartment, as no evidence inside the home tied Rhodes to the vehicle or gave the police probable cause to search the vehicle. The court also found that Rhodes' identity inevitably would have been discovered.

Following the denial of the motion to suppress, Rhodes entered a conditional guilty plea to each count of the indictment but preserved his right to appeal the denial of the motion to suppress. Rhodes was sentenced on January 8, 2010 to a total of ten years of imprisonment, four years of supervised release, and a special assessment of $300.

## II. STANDARD OF REVIEW

This court has concluded:

> When reviewing the denial of a motion to suppress, [this court] review[s] the district court's findings of fact for clear error and its conclusions of law *de novo*. A factual finding will only be clearly erroneous when, although there may be evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. Additionally, the evidence produced at a suppression hearing must be viewed in the light most likely to support the district court's decision.

*United States v. Nichols*, 512 F.3d 789, 793 (6th Cir. 2008) (citations and internal quotation marks omitted). Where credibility is at issue, "the party attacking the judicial officer's credibility determination must do more than just allege that the parties told conflicting stories. An effort must be made to demonstrate why the trial court's conclusion is clearly erroneous. On appeal all we have is the cold record, and we accord considerable deference to the credibility findings of the trial court."

*United States v. Cooke*, 915 F.2d 250, 252 (6th Cir. 1990).

## III. DISCUSSION

6

Rhodes' appeal focuses solely on the issue of credibility.

Although Rhodes argues that the district court erred in finding Officer Velez's version of events more credible than his in denying the motion to suppress, "[w]here there are two permissible views of the evidence[,] the district court's conclusions cannot be clearly erroneous." *United States v. Sanford*, 476 F.3d 391, 394 (6th Cir. 2007) (citations and internal quotation marks omitted). Here, Rhodes has not demonstrated that the district court's view of the evidence was impermissible. While Rhodes asserts that there were inconsistencies in Officer Velez's testimony, thus raising questions as to Velez's credibility and the district court's view of his testimony, Rhodes identifies in his brief only one alleged inconsistency.

The testimony Rhodes identifies as inconsistent is at worst ambiguous, and not clearly inconsistent. Velez testified that after he and Riegel drove by Rhodes, they had to wait for one or two cars to pass before they could make their turn to head back toward him. On cross-examination, Velez testified that they did not need to put their lights on after observing Rhodes "because there were no other cars coming. The cars that were actually coming that had to swerve was [sic] already gone."

Although Rhodes states that this testimony is inconsistent, no inconsistency is apparent. While there may not have been cars swerving to avoid Rhodes' vehicle at the time the police were turning around, there still could have been cars in the other lane of traffic passing by that the police had to wait for before turning. This testimony is therefore not clearly inconsistent and does nothing to cast doubt on the district court's credibility findings.

Additionally, Rhodes has not demonstrated the district court clearly erred in crediting Officer Velez's testimony over Rhodes' after concluding that it was difficult to comprehend how police could have located Rhodes if he had not fled from the police and had been inside the apartment for five to ten minutes before they arrived.

Moreover, the district court's credibility findings are supported by Rhodes' counsel's stipulating at the evidentiary hearing to the admission of documentary evidence showing Rhodes made inconsistent statements "in the reporting of certain matters with regard to this case." Rhodes' counsel not only stipulated to the admission of this evidence but stipulated that it contained inconsistencies.

Accordingly, Rhodes has not met his burden of demonstrating that the district court's credibility findings were clearly erroneous, as he has not shown that the district court's view of the evidence was impermissible.

Under the facts as found by the district court, the stop and detention of Rhodes, and the search of the vehicle that police conducted, did not violate the Fourth Amendment. Rhodes has failed to identify any legal error in the district court's ruling that would warrant reversal. We agree with the district court that the evidence was obtained lawfully.

## IV. CONCLUSION

For the foregoing reasons, we **AFFIRM**.