[Cite as *State v. Bello-Mancilla*, 2017-Ohio-8003.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 16AP-787 |
| v. | : | (M.C. No. 2016 TRC 144540) |
| Marco A. Bello-Mancilla, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

---

D E C I S I O N

Rendered on September 29, 2017

---

**On brief:** *Richard C. Pfeiffer, Jr.*, City Attorney, and *Alex Fowler*, for appellee. **Argued:** *Alex Fowler*.

**On brief:** *John A. Bell*, for appellant. **Argued:** *John A. Bell*.

---

APPEAL from the Franklin County Municipal Court

SADLER, J.

{¶ 1} Defendant-appellant, Marco A. Bello-Mancilla, appeals from a judgment of the Franklin County Municipal Court in favor of plaintiff-appellee, State of Ohio. For the reasons that follow, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} On June 6, 2016, appellant was cited for failing to drive within marked lanes, in violation of R.C. 4511.33, a minor misdemeanor, failing to wear a safety belt, in violation of R.C. 4513.263, a minor misdemeanor, and operating while under the influence of alcohol ("OVI"), in violation of both R.C. 4511.19(A)(1)(a) and (A)(2), misdemeanors of the first degree. On August 9, 2016, appellant filed a motion to suppress evidence seeking exclusion of "[t]he testimony of the arresting officer as to any observations made of the Defendant's conduct at an[y] time after the said officer initiated the traffic stop * * * on June 6, 2016." (Def.'s Mot. to Suppress Evidence at 1.)

{¶ 3} The trial court conducted an evidentiary hearing on the motion on September 15, 2016. At the suppression hearing, Trooper William Bogantz of the Ohio State Highway Patrol testified that on June 6, 2016, he was on patrol near I-71, north of Columbus, in Franklin County, Ohio. Bogantz was in his marked state highway patrol cruiser, and he was wearing his uniform. The cruiser was equipped with a video recorder. The trial court admitted the dash-cam video tape into evidence as State's Exhibit A, and the prosecutor played the video as Bogantz testified. The initial time indicated on the dash-cam video is just past 2:59 a.m.

{¶ 4} Bogantz stated that he first encountered appellant's blue Acura vehicle when he turned north on Busch Boulevard from westbound Dublin-Granville Road. According to Bogantz, appellant had stopped his vehicle at the traffic light in the left turn lane nearest the median, preparing to make a left turn onto eastbound Dublin-Granville Road. Bogantz testified that he made a U-turn on Busch Boulevard and pulled behind appellant's vehicle in the left turn lane. According to Bogantz, appellant's vehicle "was the only vehicle on the roadway at the time in my view, so I turned around and got behind it." (Tr. at 9.) Bogantz described the reason for the subsequent traffic stop as follows:

> The reason for the traffic stop, I was behind a – it was a blue Acura on Busch Boulevard stopped at the light at State Route 161. As I was behind the vehicle, there were two left-turn lanes. The vehicle was in the left of the two left-turn lanes. As the vehicle – When the light turned green and the vehicle made its left turn, it did not stay in the left lane. It drifted across to the right lane and it even went over the right – the solid white line on the right side of the roadway.

(Tr. at 8.)

{¶ 5} On cross-examination, Bogantz acknowledged that the dash-cam video shows another vehicle ahead of his in the distance as Bogantz approached the intersection on westbound Dublin-Granville Road. When appellant's trial counsel asked Bogantz why he decided to make a U-turn in order to get behind appellant's vehicle, he answered "I don't recall." (Tr. at 22.) When the trial court asked Bogantz whether he had already decided to initiate a traffic stop of appellant's vehicle when he made the U-turn, Bogantz responded: "I had not. He had not committed no violation at the time." (Tr. at 26.) Bogantz also acknowledged that U-turns are generally prohibited in an intersection.

{¶ 6} At the close of the suppression hearing, the trial court announced its decision denying appellant's motion to suppress. On October 27, 2016, appellant pleaded no contest to all four charges. The trial court convicted appellant and sentenced appellant to 180 days in jail, with 158 days suspended and two days of jail-time credit, a fine of $525, and two years of post-release control.[1]

{¶ 7} Appellant timely appealed to this court from the trial court judgment. The trial court stayed execution of sentence pending the appeal.

## II. ASSIGNMENT OF ERROR

{¶ 8} Appellant sets forth a single assignment of error as follows:

> The Trial Court erred to the substantial prejudice of the Defendant-Appellant and abused its discretion when it overruled the Motion to Suppress the testimony of the officer who initiated a traffic stop of the Defendant-Appellant without probable cause and in violation of his rights under the Fourth Amendment to the United States Constitution and Article I, Section 1.14 of the Ohio Constitution.

## III. STANDARD OF REVIEW

{¶ 9} " 'Appellate review of a motion to suppress presents a mixed question of law and fact.' " *State v. Neal*, 10th Dist. No. 15AP-771, 2016-Ohio-1406, ¶ 7, quoting *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. " 'When considering a motion to suppress, the trial court assumes the role of fact finder and, accordingly, is in the best position to resolve factual questions and evaluate witness credibility.' " *Neal* at ¶ 7, quoting *Columbus v. Body*, 10th Dist. No. 11AP-609, 2012-Ohio-379, ¶ 9, citing *Burnside* at ¶ 8, citing *State v. Mills*, 62 Ohio St.3d 357, 366 (1992). " 'As such, an appellate court must accept the trial court's factual findings if they are supported by competent, credible evidence.' " *Neal* at ¶ 7, quoting *Body* at ¶ 9, citing *Burnside* at ¶ 8, citing *State v. Fanning*, 1 Ohio St.3d 19 (1982). " 'Accepting these facts as true, the reviewing court must then independently determine, without deference to the trial court's conclusion, whether the facts satisfy the applicable legal standard.' " *Neal* at ¶ 7, quoting *Body* at ¶ 9, citing *Burnside* at ¶ 8.

---

[1] The trial court merged the two OVI convictions for purposes of conviction and sentence.

## IV. LEGAL ANALYSIS

{¶ 10} In appellant's sole assignment of error, appellant argues that the trial court erred by denying his motion to suppress because Bogantz violated appellant's constitutional rights by initiating a traffic stop without sufficient cause. We disagree.

{¶ 11} " 'It is well-established that stopping an automobile, thus temporarily detaining its occupants, constitutes a seizure under the Fourth Amendment to the United States Constitution.' " *State v. Phillips*, 10th Dist. No. 14AP-79, 2014-Ohio-5162, ¶ 16, quoting *State v. Dorsey*, 10th Dist. No. 04AP-737, 2005-Ohio-2334, ¶ 17, citing *Delaware v. Prouse*, 440 U.S. 648, 653 (1979). "Further, 'the seizure of a person without the authority of a warrant is per se unreasonable, and therefore unconstitutional, unless an exception applies.' " *Phillips* at ¶ 16, quoting *Dorsey* at ¶ 17, citing *Katz v. United States*, 389 U.S. 347, 357 (1967). " 'One such exception is commonly known as an investigative or *Terry* stop.' " *Phillips* at ¶ 16, quoting *Dorsey* at ¶ 17, citing *Terry v. Ohio*, 392 U.S. 1 (1968).

{¶ 12} "To legitimately effectuate a traffic stop [under *Terry*], an officer must have a reasonable and articulable suspicion of criminal activity." *State v. Johnson*, 10th Dist. No. 16AP-689, 2017-Ohio-5527, ¶ 18, citing *State v. Young*, 6th Dist. No. E-13-011, 2015-Ohio-398, ¶ 21, citing *State v. Hageman*, 180 Ohio App.3d 640, 2009-Ohio-169, ¶ 11 (6th Dist.). *See also State v. McCandlish*, 10th Dist. No. 11AP-913, 2012-Ohio-3765, ¶ 10 (observation of a traffic violation by an officer is enough for reasonable and articulable suspicion to stop a vehicle). "Reasonable suspicion entails some minimal level of objective justification, 'that is, something more than an inchoate and unparticularized suspicion or "hunch," but less than the level of suspicion required for probable cause.' " *State v. Jones*, 188 Ohio App.3d 628, 2010-Ohio-2854, ¶ 17 (10th Dist.), quoting *State v. Jones*, 70 Ohio App.3d 554, 556-57 (2d Dist.1990), citing *Terry* at 27. "In evaluating reasonable suspicion to support the propriety of a traffic stop, a reviewing court must consider the totality of the circumstances surrounding the stop as ' "viewed through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold." ' " *State v. Smith*, 10th Dist. No. 13AP-592, 2014-Ohio-712, ¶ 10, quoting *McCandlish* at ¶ 7, quoting *State v. Andrews*, 57 Ohio St.3d 86, 87-88 (1991).

{¶ 13} R.C. 4511.33(A) provides in relevant part:

> Whenever any roadway has been divided into two or more clearly marked lanes for traffic, or wherever within municipal corporations traffic is lawfully moving in two or more substantially continuous lines in the same direction, the following rules apply:
>
> (1) A vehicle or trackless trolley shall be driven, as nearly as is practicable, entirely within a single lane or line of traffic and shall not be moved from such lane or line until the driver has first ascertained that such movement can be made with safety.

{¶ 14} R.C. 4511.33 "requires a driver to drive a vehicle entirely within a single lane of traffic." *State v. Mays,* 119 Ohio St.3d 406, 2008-Ohio-4539, ¶ 16. "Thus, '[w]hen an officer observes a vehicle drifting back-and-forth across an edge line, the officer has a reasonable and articulable suspicion that the driver has violated R.C. 4511.33.' " *State v. Comer,* 10th Dist. No. 13AP-955, 2014-Ohio-5755, ¶ 11, quoting *Mays* at ¶ 16. *See also Neal* (officer's observation of a marked lanes violation justified the initial traffic stop); *State v. Chambers,* 3d Dist. No. 5-10-29, 2011-Ohio-1305, ¶ 21 ("After witnessing [defendant] cross over the white edge line, [the officer] had probable cause, and thus a reasonable articulable suspicion, that [defendant] violated R.C. 4511.33; and therefore, the stop was constitutionally valid."); *State v. Tarlton,* 4th Dist. No. 02CA688, 2002-Ohio-5795 (upholding stop where officer observed vehicle's left tires cross roadway's yellow center line by approximately one tire length); *State v. Pence,* 2d Dist. No. 2013-CA-109, 2014-Ohio-5072 (deputy had reasonable and articulable suspicion that defendant committed a traffic offense based on deputy's testimony that he observed defendant drive left of the center line for two seconds in violation of R.C. 4511.33).

{¶ 15} Appellant's argument at the suppression hearing was that Bogantz made the decision to stop appellant's vehicle well before appellant committed any traffic violation. According to appellant's motion to suppress, it "seems likely that [appellant] was singled out for 'Driving While Mexican.' " (Def.'s Mot. to Suppress Evidence at 9.) The record is devoid of any testimony by Bogantz that he knew appellant was of Mexican descent prior to making the traffic stop.

{¶ 16} Moreover, "the Supreme Court has stated that '[w]here a police officer stops a vehicle based on probable cause that a traffic violation has occurred or was occurring,

the stop is not unreasonable under the Fourth Amendment to the United States Constitution even if the officer had some ulterior motive for making the stop, such as a suspicion that the violator was engaging in more nefarious criminal activity.' " *Johnson* at ¶ 25, quoting *Dayton v. Erickson*, 76 Ohio St.3d 3 (1996), syllabus. *See also State v. Ewing*, 10th Dist. No. 09AP-776, 2010-Ohio-1385, ¶ 16; *State v. Stokes*, 10th Dist. No. 07AP-960, 2008-Ohio-5222, ¶ 29. Consequently, it is not relevant to our Fourth Amendment analysis whether Bogantz decided to stop appellant's vehicle before he observed a traffic violation or after. *Johnson, Erickson*; *Ewing*; *Stokes*.

{¶ 17} Similarly, the United States Supreme Court has stated that "the Constitution prohibits selective enforcement of the law based on considerations such as race. But the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment." *Whren v. U.S.*, 517 U.S. 806, 813 (1996). *See also United States v. Cousin*, 448 Fed.Appx. 593, 594 (6th Cir.2012); *United States v. Nichols*, 512 F.3d 789, 794-95 (6th Cir.2008); *United States v. Ross*, 300 Fed.Appx. 386 (6th Cir.2008). " 'Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.' " *Id.* at 390, quoting *Whren* at 813. Ohio appellate courts that have considered the issue have also rejected the notion that racial profiling implicates the exclusionary rule under the Fourth Amendment. *See, e.g., Chambers* at ¶ 22; *State v. Coleman*, 3d Dist. No. 5-13-15, 2014-Ohio-1483, ¶ 18; *Cleveland v. Oko*, 8th Dist. No. 103278, 2016-Ohio-7774, ¶ 20; *State v. Dukes*, 4th Dist. No. 16CA3745, 2017-Ohio-7204, ¶ 17.

{¶ 18} In this case, the trial court denied appellant's motion for the following reasons:

> I think the lane change during the turn was illegal because, when you have two turns – or two lanes turning left at an intersection like that, you have to stay in the one that you started out in. And just knowing the area, there's plenty of time to make the turn into the left lane. And there is a turning-at-an-intersection law that does state when you're turning left, you turn into the closest lane to the center, which I see the violation every day of that, but rarely do I see stops based upon it. *But that coupled with the marked lanes on the – The tires weren't on the line. They were clearly over the*

> *line, so I think that there was a reasonable suspicion for the stop.* The motion to suppress here will be overruled.

(Emphasis added.) (Tr. at 38-39.)

{¶ 19} In our view, Bogantz's testimony, standing alone, supports the trial court's conclusions. *Comer* (where dash-cam video was of poor quality to prove the lane violation, the trial court was correct to rely on officer's testimony). Moreover, the dash-cam video corroborates the essential details of Bogantz's testimony. The video shows Bogantz's cruiser heading west on Dublin-Granville Road approaching the intersection with Busch Boulevard. The time on the video is 24 seconds past 2:59 a.m. Appellant's vehicle comes into view at 2:59 and 38 seconds. Appellant's vehicle is shown in the distance, approaching the red traffic light at southbound Busch Boulevard and Dublin-Granville Road. At the time appellant's vehicle comes into sight, the only other vehicle visible is an unidentified vehicle traveling some distance ahead of Bogantz's cruiser on westbound Dublin-Granville Road. Appellant's vehicle then stops in the left turn lane nearest the median, preparing to make a left-hand turn onto Dublin-Granville Road eastbound towards I-71.

{¶ 20} As Bogantz approaches the intersection, he steers his cruiser into the right-hand turn lane of westbound Dublin-Granville Road to make a right turn, with the green light, onto northbound Busch Boulevard. When Bogantz turns his vehicle right onto northbound Busch Boulevard, appellant's vehicle remains stopped at the red light. Bogantz then travels a short distance north on Busch Boulevard, to clear the median, before making a U-turn and heading back toward the intersection. Bogantz stops his cruiser behind appellant's vehicle in the left turn lane. Appellant's vehicle is still sitting at the red light in the left turn lane at that time with the turn signal activated. There is a second left-hand turn lane immediately to the right of the lane appellant's vehicle occupies and another lane to the right of that for vehicles either continuing through the intersection on Busch Boulevard or turning right onto Dublin-Granville Road heading west. We note that the physical characteristics of the person driving the blue Acura are not discernable in the dash-cam video as Bogantz turned his cruiser on to Busch Boulevard.

{¶ 21} As appellant continues to wait for the light to turn green, one vehicle is seen driving through the intersection eastbound on Dublin-Granville Road and, a few seconds later, another vehicle drives through the intersection westbound.  There are no other vehicles on Busch Boulevard.  When the light turns green, appellant's vehicle immediately crosses the broken white line from the left turn lane nearest the median to the turning lane to the right, without signaling, and then continues turning in a wide arc before crossing the solid white line between the right-hand lane of eastbound Dublin-Granville Road and the curb.  The video clearly shows both passenger side tires of appellant's vehicle entirely across the solid white line marking the curb.  At that point in time, Bogantz activates the overhead lights on his cruiser and appellant's vehicle stops almost immediately.

{¶ 22} Based on our independent review of the dash-cam video, we agree with the trial court that appellant committed a clearly observable violation of R.C. 4511.33, just prior to the traffic stop.  The video tape does not reveal any large ruts or other obstructions in the paved portion of the roadway that would have required appellant to move his vehicle from one turn lane to the other or to cross the solid white line with both passenger side tires.  Similarly, though Bogantz was mistaken when he testified that appellant's vehicle was the only vehicle in the area, the video tape confirms that appellant's vehicle was the only vehicle traveling on Busch Boulevard.  Moreover, the trial court expressly relied on its own review of the dash-cam video in reaching its conclusion.

{¶ 23} Based on the foregoing, we find that the initial traffic stop was supported by a reasonable suspicion that appellant had committed a marked lanes violation.  *Mays*; *Comer*; *Neal*; *Chambers*; *Tarlton*; *Pence.*  Accordingly, we hold that the trial court did not err when it denied appellant's motion to suppress.  Appellant's sole assignment of error is overruled.

## V.  CONCLUSION

{¶ 24} Having overruled appellant's sole assignment of error, we affirm the judgment of the Franklin County Municipal Court.

*Judgment affirmed.*

KLATT, J., concurs.
HORTON, J., dissents.

HORTON, J., dissenting.

{¶ 25} As the majority notes, the exclusionary rule is not a recognized remedy for seizures prompted by racial discrimination or other constitutionally impermissible motives, as long as the circumstances superficially indicate an officer's compliance with Fourth Amendment requirements. *Whren v. United States*, 517 U.S. 806, 813 (1996); *United States v. Nichols*, 512 F.3d 789, 794 (6th Cir.2008); *State v. Chambers*, 3d Dist. No. 5-10-29, 2011-Ohio-1305, ¶ 22. Thus, facts indicating an "objective" grounds for recognizing the existence of probable cause, no matter how inconsequential the offense, effectively erase an officer's racial motivation from the encounter. For a defendant subject to intentional racial discrimination in violation of the Equal Protection Clause, the only apparent remedy is a civil suit brought under 42 U.S.C. 1983. *Nichols* at 794; *Hudson v. Michigan*, 547 U.S. 586, 596-97 (2006) (declining to extend the exclusionary rule to violations of the Fourth Amendment's knock-and-announce rule). As a state court of appeals, this court is powerless to affect any change to these established principles of Fourth Amendment law.

{¶ 26} Thus, relying on *Dayton v. Erickson*, 76 Ohio St. 3d 3 (1996), the majority accepts the idea that even if Mr. Bello could prove that Officer Bogantz stopped him because of his race, its hands would be tied under current Fourth Amendment law to correct this wrong. *Erickson* can be distinguished, however, because it was decided entirely under the Fourth Amendment to the U.S. Constitution. It is within this court's power to conclude under Article I, Section 14 of the Ohio Constitution that even where reasonable suspicion exists, pretextual racial profiling is an impermissible basis for a seizure. This is because:

> The Ohio Constitution is a document of independent force. In the areas of individual rights and civil liberties, the United States Constitution, where applicable to the states, provides a floor below which state court decisions may not fall. As long as state courts provide at least as much protection as the United States Supreme Court has provided in its interpretation of the federal Bill of Rights, state courts are unrestricted in according greater civil liberties and protections to individuals and groups.

*Arnold v. Cleveland*, 67 Ohio St.3d 35, 38 (1993), paragraph one of the syllabus.

{¶ 27} For example, the Supreme Court of Ohio has held that, where no statutory exception under R.C. 2935.26 applies, a custodial arrest for a violation of a minor misdemeanor violates Article I, Section 14 of the Ohio Constitution, and is subject to suppression under the exclusionary rule. *State v. Jones*, 88 Ohio St.3d 430 (2000). Even after the United States Supreme Court held that the Fourteenth Amendment does not protect against such a seizure for a minor misdemeanor in *Atwater v. Lago Vista*, 532 U.S. 318 (2001), the Supreme Court of Ohio reaffirmed its holding in *Jones* as it applied to the Ohio Constitution, which "provides greater protection than the Fourth Amendment to the United States Constitution against warrantless arrests for minor misdemeanors." *State v. Brown*, 99 Ohio St.3d 323, 2003-Ohio-3931, paragraph one of the syllabus. *See also State v. Brown*, 143 Ohio St.3d 444, 2015-Ohio-2438 (holding that the exclusionary rule should apply to evidence collected from a seizure by an officer who acted without statutory jurisdiction, in violation of Article I, Section 14 of the Ohio Constitution).

{¶ 28} The purpose of the exclusionary rule is the deterrence of police misconduct. *United States v. Leon*, 468 U.S. 897, 916 (1984). I can think of no more pervasive and insidious misconduct practiced by the police than the racial profiling of the citizens they are sworn to protect. In this case, *something* compelled Officer Bogantz to complete an illegal U-turn and get behind Mr. Bello's car when it was legally sitting in a left-hand turn lane with the turn signal activated. The officer's initial explanation was that he did this because there were no other cars on the road, but Mr. Bello's attorney impeached the officer with the dashcam recording showing another vehicle on the road at that time. (Tr. at 9, 22.) Although Mr. Bello was not visible in the recording as Officer Bogantz turned right, the camera's view only faced forward. The officer would have had a clear line of site through his side window, making one fact apparent—Mr. Bello was an individual of Mexican descent. As it is, the record is too incomplete to give a complete picture of Officer Bogantz's motives.

{¶ 29} Mr. Bello could not elicit testimony or present evidence to support the argument that he was stopped because of his race. Under the law as it stands, it is unclear if the trial court would have even allowed him to develop the record on this issue. Extending the exclusionary rule to seizures arising from racially motivated police

misconduct would not only have provided Mr. Bello with a framework for challenging Officer Bogantz's actions, it would have served as a deterrent to other officers from engaging in racial profiling. Given the historic and current epidemic of police misconduct attributed to race-based motives that dash cams and body cams have unmasked, I can think of no more effective application of the exclusionary rule.

_____